**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CATHERINE CRUISE, In Her Own** | : | |
| **Right and as the Administratrix** | | **CIVIL ACTION NO. 3:01-2310** |
| **of the Estate of her deceased** | : | |
| **daughter, DEBORAH CRUISE,** | | **(MANNION, M.J.)** |
| | : | |
| **Plaintiff** | | |
| | : | |
| **v.** | | |
| | : | |
| **STEVE MARINO, Officer,** | | |
| **ROBERT OLECKI, Officer,** | : | |
| **DENNIS LUKASEWICZ, Officer,** | | |
| **PAUL REED, Officer,** | : | |
| **A.M. STULGIS, Officer,** | | |
| **SCRANTON POLICE** | : | |
| **DEPARTMENT, and CITY OF** | | |
| **SCRANTON,** | : | |
| | | |
| **Defendants** | : | |

## MEMORANDUM AND ORDER

Presently pending before the court is the defendants' motion for summary judgment. (Doc. No. 41). Based upon a review of the materials before the court, the defendants' motion will be granted.

## I. PROCEDURAL HISTORY

On October 26, 2001, the plaintiff initiated the instant action in the Lackawanna County Court of Common Pleas as the result of the tragic suicide of her daughter, Deborah Cruise, in a Scranton Police Department holding cell. The plaintiff alleges that her daughter's civil rights were violated, during her detention for public drunkenness and disorderly conduct, by members of the Scranton Police Department. In addition, the plaintiff raises state law wrongful death and survivor claims.

On December 5, 2001, a notice of removal was filed on behalf of the defendants. (Doc. No. 1). The defendants filed an answer to the plaintiff's complaint on April 16, 2002. (Doc. No. 2).

Discovery having concluded, on June 21, 2005, the defendants filed the instant motion for summary judgment, (Doc. No. 41), along with a statement of material facts, (Doc. No. 42), and supporting exhibits, (Doc. No. 43). On July 6, 2005, the defendants filed a brief in support of their motion for summary judgment with additional documentation.  (Doc. Nos. 47 & 48). On August 8, 2005, the plaintiff filed a brief in opposition to the defendants' motion for summary judgment with supporting exhibits, (Doc. No. 53), a response to the defendants' statement of material facts, (Doc. No. 54), and a counter statement of material facts, (Doc. No. 55)[1]. A reply brief was filed by the defendants on August 24, 2005. (Doc. No. 56).

## II.  FACTUAL HISTORY[2]

On the evening of December 18, 1999, Scranton Police Officers were dispatched to the Nativity Social Club, ("Club"), in Scranton, Pennsylvania, where the bartender had complained that Deborah Cruise, a patron at the

---

[1]This document simply references the factual statements contained in the plaintiff's brief in opposition to the defendants' motion for summary judgment.

[2]Unless otherwise noted, the facts set forth herein are undisputed, as evidenced by the defendants' statement of material facts and the plaintiff's responses thereto.

Club, had been fighting with another patron, Mr. Brown. When the officers arrived, Ms. Cruise was taken out of the Club. She became belligerent and began to yell and scream. The officers noted that Ms. Cruise smelled of alcohol and was staggering. As a result, Officer Thomas Genovese, in his capacity as a backup officer, arrested Ms. Cruise for public drunkenness and disorderly conduct. Ms. Cruise did not resist arrest and was transported to the City of Scranton Police Headquarters by Officer Paul Reed.

According to the record, Ms. Cruise had been arrested on numerous occasions by the Scranton Police Department for excessive drinking. She had previously been detained overnight in the Scranton Police Department's holding cells without incident.

On this occasion, upon arriving at police headquarters, Officer Reed testified that he assisted Officer Genovese in preparing the citations for Ms. Cruise's arrest. In response to inquiries by Officer Reed, Ms. Cruise gave two different spellings for her name. She also refused to provide a telephone number or name of someone that the officers could call to pick her up from headquarters[3]. During this time, Officer Reed testified that he asked Ms. Cruise to sit in front of the Desk Officer's desk. Officer Reed testified that he

---

[3]It is undisputed that the Scranton Police Department's protocol regarding the detention of intoxicated persons requires that, if a person is detained only as a result of their intoxication, they are given an opportunity to call a responsible adult who can pick them up and take them home. If a responsible adult cannot be contacted, the detainee is placed in a holding cell for however long it takes for the effects of the alcohol to pass. Generally, this is a period of up to four hours.

did not observe Ms. Cruise crying or physically confronting any officers at any time.

While at the Desk Officer's desk, Ms. Cruise began yelling at the Desk Officer, Ann Marie Stulgis. She also began to take off her coat, shoes and socks, and she attempted to take off her pants. Ms. Cruise then began fighting with Mr. Brown, who was also brought to the Scranton Police Headquarters. Officer Stulgis testified that Ms. Cruise exhibited an unsteady gait and failed to sit down at the desk despite numerous requests to do so.  At some point, Officer Stulgis testified that Ms. Cruise stumbled in the direction of a glass case and that she tried to convince Ms. Cruise to sit down before she fell and got hurt. Ultimately, Officer Stulgis determined that she needed to place Ms. Cruise in a holding cell for her safety because of her refusal to sit down and cooperate. Officer Stulgis testified that when she approached Ms. Cruise to search her, prior to putting her in a holding cell, Ms. Cruise attempted to take off her pants and became confrontational. Between 9:10 p.m. and 9:15 p.m., Officer Stulgis testified that she placed Ms. Cruise in a female holding cell with the assistance of another officer. At that time, Officer Stulgis testified that she did not observe Ms. Cruise exhibit any signs or symptoms of suicidal behavior, nor had Ms. Cruise been identified by any other officer as suicidal.

After placing Ms. Cruise in the holding cell, Officer Stulgis returned to the desk to take a missing person's report. Sometime between returning to the desk and prior to her leaving her shift shortly before 10:00 p.m., Officer Stulgis testified that she observed Ms. Cruise through the video monitor standing at

the cell doors and moving her mouth, but did not observe her making any gestures.

Between 9:25 p.m. and 9:45 p.m., Officer Steven Marino arrived to relieve Officer Stulgis as the Desk Officer for the 10:00 p.m. to 6:00 a.m. shift. According to Officer Stulgis' testimony, she believed that she advised Officer Marino about Ms. Cruise being in the holding cell and the fact that she refused to provide a telephone number of anyone who could pick her up.  Although Officer Marino testified that it would generally be his practice to find out the status of inmates in the holding cells upon arrival for a shift, he had no specific recollection on, this occasion, of Officer Stulgis informing him regarding the prisoners in lock-up. Officer Stulgis testified that Officer Marino indicated that he would have the Wagon Officer, coming in on the next shift, go in to see Ms. Cruise to determine whether should would then be willing to give a telephone number of someone who could pick her up.

On the date in question, Officer David Yatko was the Wagon Officer working the 3:00 p.m. to 11:00 p.m. shift. Officer Stulgis advised Officer Yatko that Ms. Cruise had been placed in a holding cell and that she was loud and drunk. Sometime between 9:50 p.m. and 10:05 p.m., Officer Yatko left police headquarters to take Sergeant Ralph Mifka, the Acting Sergeant on the 2:00 p.m. to 10:00 p.m. shift, to the Scranton Police roll call, located in the basement of the Steamtown Mall and to get his car. It took approximately five to ten minutes for Officer Yatko to take Sergeant Mifka to his vehicle.

If there are prisoners in the holding cells, it was the practice of Officer

5

Yatko to tell the Desk Officer that he was leaving and to tell the Desk Officer to watch the prisoners on the monitor. Officer Yatko testified that he did not recall physically checking on Ms. Cruise, although he believed that he observed her on the video monitor. After taking Sergeant Mifka to his car, Officer Yatko responded to a call at the Broadway Bar assisting other officers on the call at 10:08 p.m. That call was "cleared" at 10:17 p.m.  Officer Yatko testified that it took him approximately three to five minutes from the time the call was cleared to return to Scranton Police Headquarters.

Officer Dennis Lukasewicz relieved Sergeant Mifka as the Acting Sergeant for the 10:00 p.m. to 6:00 a.m. shift. Although he was aware of the fact that Ms. Cruise was in a female holding cell, he was not aware of her name. At some point, he observed Ms. Cruise on the video monitor, but was unable to determine exactly what she was doing.

Approximately two to three minutes after Officer Yatko arrived back at the Scranton Police Headquarters, Officer Robert Olecki noted that something did not look right on the monitor when viewing Ms. Cruise's cell. Officer Olecki was on light duty as a result of an injury and was assisting Officer Marino as the Desk Officer on the evening in question. When Officer Olecki arrived on his shift, Officer Marino had already relieved Officer Stulgis as the Desk Officer.  He had not been advised by any officer that any prisoner detained in the holding cells on the evening in question was at risk for suicide. Officer Olecki observed something peculiar on the monitor when the female cells were depicted and asked Officer Marino to switch back to the female cells.

6

Officer Marino was on the telephone at the time Officer Olecki asked him to switch to the female cells and was typing something into the NCIC computer on the Desk Officer's desk. It took approximately two to three seconds for Officer Marino to switch the monitor to view the female cells. Based upon his observation of the monitor, Officer Olecki surmised that Ms. Cruise was in distress. He observed that she appeared to be hanging from the bars in her cell, her arms were limp, her posture was odd and she was not moving.

Officer Olecki yelled the code for a suicide attempt and went back to the cell as fast as he could. Ms. Cruise had tied her shirt around her neck. When Officer Yatko ran back to the female cells, he testified that he found Ms. Cruise in a sitting position with her buttocks approximately one-half to one inch off of the floor of the cell as she leaned against the door. At approximately 10:27 p.m., Officer Marino requested an ambulance to respond to the Scranton Police Headquarters. Officer Lukasewicz called the Lackawanna County Communication Center to make sure an ambulance had been dispatched.

Officer Olecki lifted Ms. Cruise up and unsuccessfully attempted to remove the shirt from the bars. Officer Yatko cut the garment from the door at which time Ms. Cruise collapsed to the cell floor. Officer Yatko then ran to get the cell door key and a CPR bag. Officer Lukasewicz testified that he believed that he ran to the back with the keys and retrieved the CPR bag from the patrol wagon and gave it to Officer Yatko.

Officer Yatko, who is the CPR instructor for the Scranton Police

7

Department, returned to the cell and repositioned Ms. Cruise to a prone position to administer CPR. Officer Olecki and Officer Yatko administered CPR. At some point, Officer Olecki had to stop administering CPR because he was unable to balance himself due to his injured leg. At this time, Officer Lukasewicz began to assist Officer Yatko.

Shortly thereafter, ambulance personnel arrived. Officer Olecki testified that he believed that the ambulance personnel were able to re-establish Ms. Cruise's pulse prior to transporting her to the hospital. Officer Yatko testified that he detected Ms. Cruise's vital signs during his attempts to resuscitate her. Based upon his understanding as a CPR instructor that you are not able to re-establish a pulse more than eight minutes from when the heart stops beating, Officer Yatko testified that he believed that Ms. Cruise had been hanging for less than eight minutes. Ms. Cruise was transported to the hospital by ambulance where she subsequently died on December 31, 1999.

The record reflects that approximately seven months prior to Ms. Cruise's suicide, another detainee, Joseph Pifcho, committed suicide in the Scranton Police Headquarters' holding cells. The parents of Joseph Pifcho filed an action, similar to the one at hand, in which they alleged violations of the decedent's constitutional rights pursuant to §1983[4]. See Pifcho v. Walsh, et al., Civil Action No. 3:01-0893 (Jones, J.). In ruling upon a motion for

---

[4]The plaintiffs had also alleged, but later withdrew, claims under the Fifth and Ninth Amendments, claims pursuant to 42 U.S.C. §1985(3), claims under the Pennsylvania Constitution, and claims under the Political Subdivision Tort Claims Act.

summary judgment filed by the defendants in that action, the Honorable John

E. Jones set forth the following undisputed facts:

> On the evening of May 20, 1999, Joseph Pifcho was detained in the Scranton Police Department with two of his friends, Donald Brennan and Mark Stanko, upon suspicion of being intoxicated and being involved in a hit and run accident.
>
> Joseph Pifcho was transported to the police station by one of the defendants, Officer Walsh. Prior to being transported to the station, Officer Walsh spoke with the detainees in a firm tone and at times used profanities toward them. According to Mark Stanko, Officer Walsh told Joseph Pifcho that he would be going to jail for the rest of his life because someone had died as a result of the car accident.
>
> The Pifchos allege that Officer Walsh's conduct amounted to verbal abuse and harassment which had the effect of placing Joseph Pifcho in a mental state whereby he was a danger to himself. Complaint at ¶ 20. For purposes of this Motion for Summary Judgment, Defendants "acknowledge Officer Walsh was rude to Decedent [and that] [h]e may have . . . intimidated Decent (sic) in his attempts to get him to admit that he was driving the car involved in the hit and run accident." (Defs.' Br. Reply Mot. Summ. J. 4).
>
> In accordance with Scranton Police Department policies[5], after arriving at the police station Joseph Pifcho was given an opportunity to call someone sober to pick him up and take him home. Because he

---

[5]Here, the court noted the following:

> "When an intoxicated person is brought into the lock up, if they [are] being detained only as a result of their intoxication, they are given an opportunity to make a call to a sober person to obtain [a ride]. If they do not have a ride, they are placed into a cell. If a person is suspected of having suicidal tendencies, they are taken immediately to the Community Medical Center."

Defendants' Statement of Material Facts ¶ 10.

did not choose to make a phone call, Joseph Pifcho was booked by Officer Monahan and then placed in Cell No. 4 in the police station[6]. According to Officer Monahan, Joseph Pifcho was joking with him during the booking process. Prior to placing Joseph Pifcho in the cell, Officer Monahan removed Joseph's shoe laces from his shoes. Officer Monahan maintains that he did not observe any behavior in Joseph Pifcho which would lead him to believe that he would hurt himself.

At the time that the events relevant to this matter occurred, the Scranton Police Department had four cells reserved for males. Cells No. 1, No. 2 and No. 3 had cameras trained on them. Cell No. 4, however, did not have a camera on it. For this reason, prisoners housed in this cell could only be observed if an officer physically walked to the cell to look inside it. Officer Monahan placed Joseph Pifcho in Cell No. 4 because the other three cells were occupied.

At approximately 4:30 a.m., Officer Monahan told the desk officer, William Wagner, that all of the detainees were safe and then left the building in order to have dinner. He returned at approximately 5:10 a.m. When he went to check on the prisoners, sometime between 5:10 a.m. and 5:18 a.m., he found that Joseph Pifcho had hung himself in his cell[7].

Scranton Police Rules and Regulations in place at the time of this incident mandated that desk officers were to check on the condition of detainees every half hour and then indicate that they had done so on a prisoner log sheet. Officer Wagner was unaware that this was one of his duties. Consequently, he failed to check on any of the prisoners that evening. Indeed, Officer Wagner was not aware that Joseph Pifcho had even been placed in Cell No. 4.

---

[6]The court noted that the booking process apparently began at 3:49 a.m., and that Joseph Pifcho was placed in Cell No. 4 between that time and 3:58 a.m.

[7]The courted noted that for purposes of the motion for summary judgment, the defendants assumed that Mr. Pifcho may not have been checked for a period of one hour prior to his suicide.

See Pifcho v. Walsh, et al., Civil Action No. 3:01-0893, (Jones, J.), Doc. No. 27, pp. 4-7.

In bringing the above action, the Pifchos alleged that the individual defendants were deliberately indifferent in placing Joseph Pifcho in a cell without a camera and in failing to adequately supervise him[8]. With respect to

---

[8]Specifically, the Pifcho court set forth the following with respect to the individual defendants:

With respect to Officer Walsh, Plaintiffs argue that his alleged verbal harassment of Decedent placed Decedent in a mental state in which it should have been obvious to Officer Walsh that Decedent was a danger to himself. Plaintiffs assert that the following conduct in particular amounts to deliberate indifference by Officer Walsh: that although Decedent was intoxicated, Officer Walsh did not check on him after the arrest; that despite Decedent's intoxication Officer Walsh failed to do any screening of Decedent's mental status; and that prior to the arrest, Officer Walsh told the Decedent that he "was going to jail for the rest of his life, [and] that someone was in the car that he hit and they may be dead."

As to Officer Monahan, Plaintiffs cite the following as evidence supporting their claim that he was deliberately indifferent to Joseph Pifcho's susceptibility to harming himself: that notwithstanding Decedent's intoxication and Officer Monahan's own concerns about using a cell without a monitor in it, Officer Monahan placed the Decedent in Cell No. 4; that Officer Monahan did not tell any other officer to check on Joseph Pifcho during the time that he left the Scranton Police Station to eat dinner; and that besides giving Joseph Pifcho the opportunity to call someone to pick him up from the Police Station,

(continued...)

the City of Scranton, the plaintiff set forth two theories of liability. Initially, the plaintiffs alleged that the City was deliberately indifferent to the needs of intoxicated and suicidally prone individuals as evidenced by the deficient policies instituted by the City to prevent suicides among detainees. Second, the plaintiffs alleged that the City was deliberately indifferent in that it failed to train its police officers in a manner by which they could adequately prevent suicides by detainees.

Turning back to the instant action, Deborah Cruise's suicide, the record reflects that the Scranton Police Department's protocol regarding the detention of intoxicated persons still required that, if a person was detained only as a result of their intoxication, they were given an opportunity to call a responsible adult who could pick them up and take them home. If a responsible adult could not be contacted, the detainee would be placed in a holding cell for however long it took for the effects of the alcohol to pass. Generally, this was a period of up to four hours.

In addition, the record indicates that officers received yearly MOPEC (Municipal Police Officer Educational Training Commission) training updates, provided by the Scranton Police Department, which dealt with various issues,

---

[8](...continued)
> Officer Walsh did not take any other special precautions or conduct any special screening with regard to Joseph Pifcho.

Pifcho, p. 14.

12

including how to deal with intoxicated persons[9].

_____

[9]The plaintiff takes some issue with respect to this statement.  However, the testimony of Officer Stulgis was as follows:

> A.   You have to take them for – for one thing, you have to take them every year for your updates.

> Q.   What do you mean your updates?

> A.   It's required by the state law that we have updates every year where we have to spend "X" number of hours in classrooms.

> Q.   And who provides those updates?

> A.   The City of Scranton.  MOPEC oversees what classes they are to give.

> * * *

> Q.   Prior to December 18, 1999, did you receiving any training regarding signs and symptoms of suicidal behavior?

> A.   Starting with municipal police training, there's an entire block on dealing with things like that. And then I'm sure it's been covered in updates.

> Q.   What do you mean by an entire block?

> A.   Municipal training is cut up into blocks, crimes, codes, vehicle code, dealing with people with problems, and on and on and on.

> * * *

> Q.   Okay.  Similar question but not the same question.  As of December 18, 1999, did you

(continued...)

13

As was the case at the time of the Pifcho suicide, the Scranton Police Department continued to follow suicide prevention measures by removing any items from the detainees which they could use to injure themselves such as hair pins, hair clips, belts, coats, socks and shoelaces.

Officer Michael Cammerota was a police officer with the City of Scranton from 1978 until 2002. In 1996, he became the training sergeant and was responsible for acquainting new officers with the operation of the

---

[9](...continued)

> receive any training from the Scranton Police Department regarding monitoring of intoxicated prisoners?

> A.     You mean formal training?

> Q.     Yes.

> A.     No. If I may, now – see, you don't – you've never been a policeman, you don't – by formal training are you saying the actual monitoring of ours or are we going back to the question that I already answered in the treatment of people under MOPEC classes?

> Q.     I'm talking either way.

> A.     Okay. Because I already answered that and said we had training in MOPEC on dealing with intoxicated persons and dealing with people with some different problems.

(Doc. No. 53, Ex. I, pp. 16, 17-18, 27-28).

14

department[10]. He testified that officers were provided a copy of the 1973 Scranton Police Rules and Regulations and advised that the rules, while dated, set forth the protocol and standards of behavior for the officers. Officer Cammerota testified that new officers would become acquainted with the various divisions of the department through officers of different ranks in each of the divisions. Specific training for any particular position within the department was provided through on-the-job training with an officer performing that particular job, rather than through instruction by Officer Cammerota.

The 1973 Rules and Regulations require that the Desk Officer document that they checked on the condition of the prisoners every half hour. A prisoner log sheet is used to keep track of prisoners in the holding cells to memorialize their name, charges against them, the time they were brought in and the time they are discharged from the cell block. The last column of the prisoner log sheet indicates when the prisoners were checked by an officer.

According to the 1973 Rules and Regulations, the Desk Officer is responsible for, among other things, maintaining the security of the desk area and the waiting area, and is responsible for all prisoners and property brought into the Scranton Police Headquarters. The Desk Officer arrives an hour earlier than the rest of the shift. There is a computer, telephone and a video

---

[10]Based upon their years of service with the City of Scranton, it would appear from the record that the only defendant who would have participated in Officer Cammerota's training would have been Officer Olecki, who became a police officer with the City of Scranton in 1997.

monitor used for monitoring prisoners on the Desk Officer's desk. Testimony indicates that the video monitor in use at that time was probably between 8 inches by 8 inches and 12 inches by 12 inches. The monitor could be set to various settings to display one or more cells at a time, as well as the ramp leading up to the police department, the central booking area and the evidence room. The Scranton Police Department had no specific policy with regard to which view the monitor must be set on at any given time. The image depicted on the monitor rotated every three to five seconds[11].

According to the record, Officer Stulgis had been a police officer with the City of Scranton since 1990. She was trained to work as the Desk Officer and was certified in that position. In order to work as the Desk Officer, an officer must receive certification through the State after completing a thirty (30) day hands-on training program. Officer Stulgis received training for monitoring detainees in the holding cells[12].

---

[11]There is testimony in the record that several officers made complaints with regard to the resolution and/or size of the video monitor. Testimony further indicates that in 2002, after the incident in question, complaints were made with respect to the video monitoring system. At that time, the system was replaced and the City entered into a program to maintain the system on a regular basis due to a build-up of residue on the cameras.

[12]The plaintiff has denied this fact stating that "[w]hile Officer Stulgis believed that she was told that there were monitors there and what they were for, she doesn't recall any training other than to use common sense behavior." (Doc. No. 54, ¶ 88). In her deposition testimony, Officer Stulgis testified as follows:

(continued...)

16

[12](...continued)

Q.    Did you ever receive any training from the Scranton Police Department regarding monitoring of detainees in cells?

A.    Training?

Q.    Yeah.  Training or instruction?

A.    Yeah.  Well, instructions there were – I mean, you're obviously told what you have to do.

Q.    Well, that's what I'm trying to get to.

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    What instructions were you given regarding that?

A.    It would be more – I couldn't quote them verbatim. We were told, you know, there's monitors there, you know what the monitors are for, you check them, what to watch, just common sense type of behavior.

Q.    Is that what you were told, common sense or –

A.    No.  No.

Q.    – can you explain it to me?

A.    That's – I mean, it's been years.  I – you know,

(continued...)

17

Officer Stulgis testified that she was not aware that she was required to document the fact that she checked on the detainees on one-half hour increments. She further testified that she was unfamiliar with the specific provision in the 1973 Scranton Police Rules and Regulations which provided "the desk patrolmen while on his tour of duty shall inspect the cells every half hour to check the condition of the prisoners. Any unusual occurrences shall be immediately reported to the commanding officer and log the inspection on the state form." In fact, Officer Stulgis testified that it was her position that the

_____

[12](...continued)
> I don't – I can't quote anybody as to exactly what they said.
>
> Q.   Okay.
>
> A.   But it was – what was expected of you would be common sense behavior.
>
> Q.   Do you recall who gave you the instructions?
>
> A.   Supervisors.

Officer Stulgis' testimony was that she, in fact, received instruction with respect to monitoring inmates, and that the instruction came from her supervisors by way of informing her that the monitors were there, what the monitors were to be used for, how to check the monitors and what to watch for.

This is supported by the testimony of Officer Cammerota, who testified that those performing the duties of a Desk Officer would not necessarily receive classroom training with respect to monitoring detainees, but would receive hands-on training from a more senior Desk Officer.

detainees should be monitored on a more frequent basis.

Officer Marino, a police officer with the City of Scranton since 1995, testified that he received training as to monitoring prisoners in his position as a Desk Officer, but did not log each time he checked a detainee. He further testified that he was familiar with the City of Scranton's protocol for referring any prisoners exhibiting suicidal behavior to the Community Medical Center for observation.

Officer Yatko, a police officer with the City of Scranton since 1993, knew that one of his responsibilities as the Wagon Officer was to monitor the condition of the prisoners in the holding cells, but was not aware of any policy as to the frequency or documenting that monitoring of the prisoners. When he was unable to physically check on the prisoners, he would look at the video monitor to observe the prisoners. Officer Yatko believed that, if he was out of the building, the Desk Officer or another officer would check on the condition of the prisoners. When Officer Yatko would leave police headquarters, it would be his practice to tell the Desk Officer that he was leaving and to tell him to watch the prisoners on the monitor.

Officer Lukasewicz, a police officer with the City of Scranton since 1991, received training in the signs and symptoms of suicidal behavior, but was never given any training as to questions or inquiries to make of a detainee to determine whether they were exhibiting suicidal behavior.

Officer Olecki, a police officer with the City of Scranton since 1997, did not recall any specific training as to the signs and symptoms of suicidal

19

behavior. He was aware, however, of the Scranton Police Department's protocol for removing items from prisoners which they could use to harm themselves. Officer Olecki testified that he had no formal training as to the signs and symptoms of suicidal behavior, but that he is able to recognize a person's propensity toward suicide from his experience, as well as his observations of statements made and actions taken by individuals. He was also aware of the Scranton Police Department's protocol for taking any prisoners to the Community Medical Center, for a mental evaluation, if they exhibited suicidal tendencies or threatened to harm themselves. While he knew that it was the Desk Officer's responsibility to monitor the prisoners through the use of the video monitor, he was not aware of any particular policy setting forth the frequency of that monitoring or the need to document that he checked on the prisoners on the prisoner log sheet. According to Officer Olecki's testimony, there were between five and nine unsuccessful suicide attempts in the Scranton Police Department's holding cells since he was hired and only one successful suicide, that of Joseph Pifcho, seven months prior to Ms. Cruise's suicide[13].

Captain Kevin Mitchell, Captain of the Patrol Division for the City of Scranton during the relevant period of time and an officer with the City of Scranton since 1978, testified that he promulgated rules and regulations

---

[13]Former Police Chief James Klee, employed as an officer with the City of Scranton from 1962 until 2002, testified that he had no specific recollection with respect to the number of successful suicides in the forty years he was with the department, but believed that there had only been "a few."

20

sometime between May 20, 1999, and December 18, 1999, which changed the primary responsibility for monitoring the prisoners from the Desk Officer to the Wagon Officer[14]. Specifically, the new job description for the Wagon Officer required the officer to check and log the prisoners on one-half hour intervals until their services were needed in the field. The Desk Officer would assist the Wagon Officer in monitoring the prisoners by looking at the monitor. These changes were designed to alleviate some of the burden placed upon the Desk Officers, as that position encompassed numerous responsibilities. Captain Mitchell testified that the union challenged the amendment to the policies and, therefore, superiors were not allowed to discipline any officer found in violation of the policies. However, he testified that he believed that the rules and regulations were in effect[15].

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the "pleadings, depositions,

---

[14]Captain Mitchell testified that, while he was in a position to make recommendations with respect to policy changes, it was the Chief of Police who had the ultimate policymaking authority and who would implement the policy changes.

[15]The defendants have not provided evidence that any officer received copies of the new job descriptions. Any new job description for the Wagon Officer or Desk Officer would have been attached to an Order which the officers would sign acknowledging they received the new policy. Again, the defendants have not provided copies of any orders which were circulated as to the new policies and procedures for the job descriptions of the Wagon Officer and Desk Officer.

answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for

its motion and identifying those portions of the record which demonstrate the

absence of a genuine issue of material fact. Id. The moving party can

discharge that burden by "showing . . . that there is an absence of evidence

to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the

evidence presented, could find for the nonmoving party." Childers v. Joseph,

842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted). Material facts are

those which will effect the outcome of the trial under governing law. Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the

evidence or make credibility determinations. <u>Boyle v. County of Allegheny</u>, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. <u>Id.</u> at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. <u>Id.</u>

## IV.  DISCUSSION

Initially, the court notes that the plaintiff set forth in her complaint a cause of action pursuant to 42 U.S.C. §1985(3). (Doc. No. 1, ¶ 32). In their motion for summary judgment, the defendants argue that summary judgment should be entered in their favor on this claim because there is no evidence that the defendants treated Deborah Cruise in a discriminatory manner. (Doc. No. 47, pp. 28-31). The plaintiff failed to respond to this argument in her opposing brief. Therefore, pursuant to Local Rule 7.6, the defendants' motion for summary judgment is deemed unopposed in this respect and will be granted.

Similarly, the plaintiff also alleged in her complaint Pennsylvania common law wrongful death and survivor claims. (Doc. No. 1, Counts IV & V). In their motion for summary judgment, the defendants argue that summary judgment should be entered in their favor on these claims because they are immune from liability under the Political Subdivision Tort Claims Act and the

23

laws of the Commonwealth of Pennsylvania. (Doc. No. 47, pp. 50-53). Again, the plaintiff failed to respond to this argument in her opposing brief. Therefore, the defendants' motion for summary judgment is also deemed unopposed in this respect and will be granted[16].

The remaining claims, therefore, are the plaintiff's claims pursuant to 42 U.S.C. §1983. Specifically, the plaintiff alleges: (1) that the conduct of the individual officers amounted to deliberate indifference to Ms. Cruise's serious medical needs; (2) the City of Scranton's failure to have adequate policies and training regarding identification and monitoring of prisoners at risk for suicide, including intoxicated prisoners, amounted to deliberate indifference; (3) the City of Scranton's failure to have clear, consistent and well-communicated policies and training regarding monitoring of detainees amounts to deliberate indifference; (4) the City of Scranton's practice of failing to respond to multiple complaints from its own officers regarding the video monitoring system amounted to deliberate indifference; and (5) the City of Scranton's lack of policies to ensure proper use of the intercom system while monitoring prisoners amounted to deliberate indifference.

### A.  Individual Defendants' Liability

Ms. Cruise was a pre-trial detainee when she committed suicide. The

---

[16]The court notes that even if the plaintiff had opposed these arguments, they are well taken on the merits and would require entry of summary judgment in favor of the defendants.

Third Circuit first examined liability under §1983 for such suicides in <u>Colburn</u> <u>v. Upper Darby Township</u>, 838 F.2d 663 (3d Cir.1988) ("<u>Colburn I</u>" ). There, the court held that "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." <u>Id.</u> at 669. This standard was elaborated upon in <u>Colburn v. Upper Darby</u> <u>Township</u>, 946 F.2d 1017 (3d Cir.1991) ("<u>Colburn II</u>" ), where the court wrote that a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. <u>Colburn II</u>, 946 F.2d at 1023.

In <u>Colburn II</u>, the court explained that <u>Colburn I</u> rested primarily upon the Supreme Court's decision in <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). <u>Estelle</u> involved an Eighth Amendment claim arising from allegations of inadequate medical care[17]. <u>Colburn II</u>, 946 F.2d at 1023. The Supreme Court held in

[17]Because a pre-trial detainee has not been convicted of any crime, the due process clause of the Fourteenth Amendment prohibits the state from imposing punishment. <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 319-21 (3d Cir. 2005)(citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)). Nevertheless, in cases involving pre-trial detainees' suicides, the courts have looked to the Eighth Amendment because the due process rights of pre-trial detainees are at least as great as the Eighth Amendment rights of convicted and sentenced prisoners and because "no determination has as yet been made regarding how much more protection unconvicted prisoners should receive." <u>Id.</u> (citing <u>Boring v. Kozakiewicz</u>, 833 F.2d 468, 471-472 (3d (continued...)

25

Estelle, that "prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" Colburn II, at 1023 (citations omitted). This standard "requires deliberate indifference on the part of prison officials and [that] the prisoner's medical needs . . . be serious." Colburn II, 946 F.2d at 1023 (quoting Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir.1987)).

A particular vulnerability to suicide represents a serious medical need. Colburn II, 946 F.2d at 1023. "The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition." Colburn II, 946 F.2d at 1024. "[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Id. (citations omitted).

However, "[e]ven where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood." Colburn II, 946 F.2d at 1024. Whether the custodial officials "knew or should have known" can be demonstrated when the officials have "actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Id. At 1025 n.4 (citations omitted). "[I]t is not necessary that the custodian have a

---

[17](...continued)
Cir.1987); Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir.1993); Whitley v. Albers, 475 U.S. 312, 327 (1986) (noting that the Court has reserved the question of whether pre-trial detainees are entitled to greater protections than convicted prisoners "outside the prison security context.")).

subjective appreciation of the detainee's 'particular vulnerability'." Id. at 1024-25. "Nevertheless, there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." Id. at 1025. "The 'strong likelihood' of suicide must be 'so obvious that a lay person would easily recognize the necessity for' preventative action; the risk of self-inflicted injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Id. (Internal citations omitted).

In this case, the plaintiff has failed to establish that Ms. Cruise had a particular vulnerability to suicide. On the date in question, the record establishes that Ms. Cruise was intoxicated and disorderly. However, there is no indication that she threatened or attempted suicide, or exhibited any behavior which would lead one to believe that she may commit suicide. Contrary to the plaintiff's claims, the fact that Ms. Cruise was intoxicated, in and of itself, is not a *per se* indication of suicidal tendency. See Pifcho v. Walsh, et al., Civil Action No. 3:01-0893 (Jones, J.)(citing Gunn v. City of Allentown, 1992 WL 191144 **6, 7 (E.D.Pa.)("the bare fact that a detainee is intoxicated does not indicate a need for enhanced protective measures."))[18].

_____

[18]The plaintiff in the instant action has obtained the same expert who was obtained by the Pifchos. As in the Pifcho case, the plaintiff has placed great emphasis on the expert's report which contends that there is a strong relationship between intoxication and suicide which has resulted in national standards requiring that intoxicated detainees remain under close supervision.
(continued...)

In her opposing brief, the plaintiff argues that the fact that Ms. Cruise did not wish to call someone to pick her up "was consistent with being shamed and embarrassed at being arrested," and should have raised red flags for the defendants. This, however, is pure speculation on the part of the plaintiff. There is no evidence that Ms. Cruise exhibited any shame or embarrassment because of her arrest which resulted in suicidal tendencies.

There is also no indication that the defendants knew or should have known that Ms. Cruise had any particular vulnerability to suicide. In fact, to the contrary, this was only one of several arrests of Ms. Cruise for public intoxication. On all previous occasions, she had been detained in the Scranton holding cells without incident. In other words, this particular plaintiff's prior history with the same police department would lead one to believe that no risk of suicide would be present simply because she was arrested for public intoxication. Moreover, there is no evidence in the record that the defendants had actual knowledge of any threats of suicide, a history of suicide

---

[18](...continued)
As in Pifcho, the reliability of this report has been called into question by the defendants on various grounds. In Pifcho, the court found that the expert's report did not take into account the number of suicides in the City of Scranton, nor any of the known characteristics of the victims of the suicides. As such, the court declined to accept the plaintiff's assertion that intoxication denotes a per se risk of suicide. Here, with the exception of references to Joseph Pifcho's suicide, the expert report has the same deficiencies in that it does not consider the overall number of suicides in the City of Scranton's holding cells, nor does it consider the known characteristics of the victims of those suicides. Therefore, as in Pifcho, this court is compelled to decline to accept any claim by the plaintiff that intoxication denotes a *per se* risk of suicide.

28

attempts, or a psychiatric diagnosis identifying such propensities with respect to Ms. Cruise.

In her opposing brief, the plaintiff further argues that the nature of the charges against Ms. Cruise should have put the officers on notice that she was a threat to herself. However, the record establishes that the plaintiff was detained and placed in a holding cell because of her intoxication, not because any officer believed that she was suicidal.

Based upon the foregoing, the plaintiff has not established the first two elements under Colburn I and Colburn II. Therefore, the defendants' motion for summary judgment will be granted with respect to the §1983 claims set forth against the individual defendants.

### B.  Municipal Liability[19]

A municipality is liable under §1983 only when a plaintiff can demonstrate that the municipality itself, through the implementation of a policy or custom causes a constitutional violation. Monnell v. New York City Department of Social Services, 436 U.S. 658, 691-95 (1978). There is no liability unless the policy or custom complained of itself violates the

---

[19]The court notes that the plaintiff has sued both the City of Scranton and the Scranton Police Department. To this extent, municipal police departments are considered to be "purely instrumentalities of the municipality with no separate identity; thus, they are not 'persons' for purposes of §1983[,]" and are not amenable to suit under the statute. See Gaines v. University of Pennsylvania Police Department, 1997 WL 624281, *3 (E.D.Pa.)(citations omitted).

Constitution or when that policy, which may not be unconstitutional itself, is the "moving force" behind the constitutional tort of one of the employees of a municipality. <u>Polk County v. Dodson</u>, 454 U.S. 312 (1981). Liability for a municipality cannot be based on the theory of respondeat superior or any type of vicarious liability theory. <u>Monnell</u>, 436 U.S. at 693-94. The municipality can only be liable if the city caused an employee to violate the constitutional rights of an individual through either following an official policy or a well-settled informal custom. <u>Id.</u>

In this case, the plaintiff claims that the City of Scranton was deliberately indifferent to Ms. Cruise's medical needs because of its failure to have adequate policies to identify detainees at increased risk for suicide, including intoxicated prisoners.

In order to establish the City's liability under the theory that Ms. Cruise's rights were violated as a result of a municipal policy or custom of deliberate indifference to her serious medical needs, the plaintiff must establish that officials, determined by the district court to be the responsible policymakers, were aware of the risk of suicide posed by intoxicated detainees in the City's holding cells and of the alternatives for preventing them, but either deliberately chose not to pursue those alternatives or acquiesced in a longstanding policy or custom of inaction in this regard. <u>Simmons v. City of Philadelphia</u>, 947 F.2d 1042, 1064 (3d Cir. 1991). In addition, the plaintiff must establish that the City's affirmative or acquiescent election to take no measures to prevent suicides caused one or more of its police officers to neglect Ms. Cruise's

serious medical needs, thereby causing her constitutional injury. Id. at 1065.

The plaintiff has identified Captain Mitchell, Police Chief Klee, and Training Sergeant Cammerota as the individuals whom she believes were the City's policymakers. Even assuming that she is correct that all of these individuals were policymakers on behalf of the City[20], the plaintiff has not presented any evidence that these policymakers were, in fact, aware of the risk of suicides by intoxicated detainees in the City's holding cells or that they knew of alternatives for preventing them and that they deliberately chose not to pursue those alternatives. "This element . . . [of] proof of a conscious choice by the identified policy makers to implement a policy which affords prisoners insufficient protection in light of the information available to the policy makers concerning the risk of suicide and in light of feasible alternatives for prevention thereof which were deliberately not implemented" is simply not presented in this case. See Gunn v. City of Allentown, 1992 WL 191144 *4 (E.D.Pa.).

Here, unlike the case in Simmons, supra, there is no evidence that the City had a history of numerous suicides at the time of the incident involving

---

[20]There is some question as to whether Captain Mitchell and Training Sergeant Cammerota were policymakers with final decisionmaking authority. To this extent, Captain Mitchell testified that, while he could recommend changes with respect to policies and procedures, he was not responsible for instituting policies or procedures. Captain Mitchell testified that the ultimate authority for doing so was with the Chief of Police. (Doc. No. 43, Ex. O, pp. 8, 16). Moreover, Training Sergeant Cammerota testified that he was not responsible for making policies, nor did he have any input into making policies on behalf of the Department. (Doc. No. 43, Ex. M, p. 35). In fact, only former Chief of Police James Klee identified himself as a policymaker on behalf of the Department.

Ms. Cruise. The testimony of record establishes that between 1997 and 1999, there was only one successful suicide attempt (that of Joseph Pifcho) and approximately five to nine unsuccessful suicide attempts. Former Police Chief Klee testified that in his forty years with the Scranton Police Department, there were no more that "a few" successful suicides. There is no evidence, other than in the case of Joseph Pifcho, that intoxication played a role in the either the suicides or suicide attempts. Therefore, the plaintiff has failed to establish that the City was aware of a history of risk of suicides among detainees, intoxicated or otherwise.

The record further establishes that the City had in place policies for removing harmful items from detainees prior to placing them in the holding cells[21]; referring any detainee who exhibited suicidal tendencies for appropriate placement at the Community Medical Center; and monitoring

---

[21]In her opposing brief, the plaintiff argues that the City's policy of having officers remove dangerous items from detainees prior to placing them in the holding cells is insufficient. In so arguing, the plaintiff relies on a string of cases, including Owens v. City of Philadelphia, 6 F.Supp.2d 373 (E.D.Pa. 1998); Foster v. City of Philadelphia, No. 01-CV-3810 (E.D.Pa. January 30, 2004); Robey v. Chester County, 946 F.Supp. 333 (E.D.Pa. 1996); Marshall v. Borough of Ambridge, 798 F.Supp. 1187 (W.D.Pa. 1992); Deemer v. County of Chester, No. 03-6538 (E.D.Pa. January 13, 2005); and Giandonato v. Montgomery County, 97-CV-0419 (E.D.Pa. May 22, 1998). As noted by the defendants, all of these cases are distinguishable from the case at bar in that they all involved instances where it was known by prison officials that the detainee either attempted suicide in the past, the detainee expressed a current desire to commit suicide which was ignored, the detainee attempted to harm themselves while in police custody, or the detainee had been diagnosed with a mental illness with suicidal ideation, which was known to prison officials. In this case, none of these factors were present.

detainees at thirty minute intervals[22]. In <u>Colburn II</u>, <u>supra</u>, the Third Circuit found that similar policies in place by the municipality did not exhibit deliberate indifference on the part of the municipality. Specifically, the court noted that Upper Darby's policies provided that detainees would be: (1) frisked on arrest; (2) searched at the station; (3) relieved of drugs, weapons and other personal belongings that could pose a hazard to themselves or others; (4) provided with medical treatment where the need was apparent; (5) held in a cell until they attained sobriety or until a family member could take custody of them; (6) observed by video monitoring; and (7) checked by an officer at least every one-half hour. The court found that these policies were indistinguishable from those in <u>City of Canton</u>, <u>supra</u>, and that, based upon these policies, the municipality had not exhibited deliberate indifference to the serious medical needs of detainees.

Moreover, the record establishes that, following Joseph Pifcho's suicide, the City took some corrective action by placing a video monitor in the cell where he was confined in an attempt to prevent any further incidents[23]. The City subsequently replaced its entire video monitoring system with an updated system and entered into a maintenance program for the system.

Based upon the record, it cannot be said that the actions of the City in

---

[22]The court notes that these policies applied whether or not the detainee was intoxicated.

[23]There is some question of fact as to whether the City, in fact, implemented stricter policies with respect to the monitoring of detainees subsequent to Joseph Pifcho's suicide.

33

relation to the policies in place at the time of Ms. Cruise's suicide exhibited deliberate indifference on the part of the City. Courts in similar cases have been hesitant to second guess "[t]he wide range of 'judgment calls' that meet constitutional and statutory requirements [and] are confided to officials outside of the Judicial Branch of Government." Litz v. City of Allentown, 896 F.Supp. 1401, 1413 (E.D.Pa. 1997)(citing Bell v. Wolfish, 441 U.S. 520, 562 (1979); Simmons v. City of Philadelphia, 947 F.2d 1042, 1068 (3d Cir. 1991)). Therefore, the defendants' motion for summary judgment must be granted in this respect.

With respect to the plaintiff's claim that the City was deliberately indifferent in failing to have clear, consistent and well-communicated policies with respect to monitoring detainees[24], again, the plaintiff has failed to

---

[24]This incorporates the plaintiff's claim that the City of Scranton did not have adequate policies with respect to monitoring detainees through the use of the video monitoring system and the intercom system which were used to monitor detainees in their cells. The court notes, however, that a police department is under no constitutional duty to install a video monitoring system. Hopson v. Cheltenham Township, 1990 U.S.Dist. LEXIS 8905 (citing Williams v. Borough of West Chester, No. 86-5835 Slip.Op. (E.D.Pa. December 15, 1988), aff'd 891 F.2d 458 (3d Cir. 1989); Galie v. Kerns, No. 85-1644 (E.D.Pa. May 27, 1987), aff'd, No. 88-1126 (3d Cir. August 26, 1988); Williams v. City of Lancaster, 639 F.Supp. 377, 384 (E.D.Pa. 1986)). Moreover, where a video monitoring system has been installed, the failure to maintain, repair or replace the video cameras has been found only to constitute negligence, not deliberate indifference. Id.; See also Bowen v. City of Manchester, 966 F.2d 13, 19 (1st Cir. 1992)(the fact that the City's video monitoring system was deficient coupled with the repeated practice of leaving the lockup unattended for periods ranging from fifteen minutes to one hour
(continued...)

establish that the relevant policymakers were aware of any such problem and that they deliberately chose not to take any corrective action.

Moreover, in reviewing the same policies which were in place at the time of Ms. Cruise's suicide, the court in <u>Pifcho</u> stated as follows:

> Our review of the record indicates that the City of Scranton's policy for monitoring detainees included the following safeguards: officers were required to check on prisoners every half hour and then to indicate that they had done so on a prison log sheet; three out of the four men's cells were monitored by video equipment[25]; lastly, as opposed to being housed within the lockup, detainees whom officers suspected of being suicidal were transported to the Community Medical Center for observation.

<u>Pifcho</u>, p. 17.

In concluding that the City of Scranton was not deliberately indifferent with respect to the policies in place for monitoring inmates, the <u>Pifcho</u> court stated:

> Our holding today should not be read as a vindication of every aspect of the policies or training that the City of Scranton has provided to its officers. However, the City's breaches, including the absence of a camera in one of four cells, and the apparent laxness in enforcing the cell check policy, amount to simple negligence and are insufficient to sustain a claim alleging violations of constitutional rights.

<u>Pifcho</u>, p. 21.

———————————

[24](...continued)
might support a finding of negligence, but not deliberate indifference).

[25]As previously discussed, it is undisputed that, after Pifcho's suicide, the City of Scranton installed a video monitoring system in the fourth men's cell area and has since upgraded its entire video monitoring system.

35

The facts of the instant action establish that the City of Scranton has in place policies with respect to the monitoring of inmates. The fact that the individual officers may not have followed those policies or that the City did not strictly enforce the policies does not render the policies themselves unconstitutional, nor does it establish deliberate indifference on the part of the City. Therefore, the defendants' motion for summary judgment will also be granted in this respect.

The plaintiff next argues that the City of Scranton was deliberately indifferent in that it failed to train its police officers to identify detainees at increased risk for suicide and to properly monitor detainees in their cells[26]. To this extent, "[g]eneric claims of inadequate training are not enough; the plaintiff must identify *specific training* that the defendant municipality did not give, *and* must explain how the lack of training actually 'caused' the decedent's suicide. The causation standard requires more of the plaintiff than simply 'point[ing] to something the [municipal defendant] 'could have done' to prevent the unfortunate incident.' Rather the alleged failure to train must *itself* have been 'closely related to the ultimate injury.' Herman v. Clearfield County, 836 F.Supp 1178, 1187-88 (W.D.Pa. 1993)(internal citations omitted). Moreover, it is not enough to suggest "that the [municipality's] employees could have been better trained or that additional training was available that

---

[26]Again, this incorporates the plaintiff's claim that the City of Scranton did not properly train its officers with respect to the video monitoring system and the intercom system which were used to monitor detainees in their cells. See n.19.

would have reduced the overall risk of constitutional injury." <u>Colburn II</u>, 946 F.2d at 1030.

In <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314 (3d Cir. 2005), the Third Circuit reiterated the standard of municipal liability with respect to a failure to train claim. In doing so, the court noted that a municipality is only liable for failing to train when that "failure amounts to 'deliberate indifference to the [constitutional] rights of persons with whom the police come in contact'." <u>Id.</u> at p. 324 (citing <u>Colburn v. Upper Darby Township</u>, 946 F.2d 1017, 1028 (3d Cir. 1991)("<u>Colburn II</u>")(quoting <u>City of Canton</u>, 489 U.S. at 388)).

> Only where a municipality's failure to train its employees in relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under §1983 . . . Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality – a "policy" as defined by our prior cases – can a city be liable for such a failure under §1983.

<u>Id.</u> (citing <u>City of Canton</u>, 489 U.S. at 389). Therefore, not all failures or lapses in training will support liability under §1983. Moreover, "the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury." <u>Id.</u> (citing <u>Colburn II</u>, 946 F.2d at 1028 (quoting <u>City of Canton</u>, 489 U.S. at 391)). In <u>City of Canton</u>, the Court emphasized that a plaintiff asserting a failure to train theory is "required to prove that the deficiency in training actually caused [the constitutional violation, i.e.,] the [police custodian's] indifference to her medical needs." <u>Id.</u> (quoting <u>City of Canton</u>, at 391).

The <u>Woloszyn</u> court set forth the following with respect to liability for a failure to train claim in the context of a prison suicide:

> <u>City of Canton</u> teaches that . . . [i]n a prison suicide case, [under §1983] . . . the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives.

<u>Woloszyn</u>, 396 F.3d at 325 (citing <u>Colburn II</u>, 946 F.2d at 1029-30).

The plaintiff in this case must establish that Ms. Cruise's rights were violated as a result of a City of Scranton official policy or custom not to train its police officers, which policy or custom that was the product of a conscious decision not to act on a known risk of prison suicides despite the availability of alternatives for preventing such suicides. <u>Simmons</u>, 947 F.2d at 1064. The plaintiff must also establish that the City of Scranton's alleged policy or custom actually caused Ms. Cruise's suicide. <u>Id.</u> at 1067.

To the extent that the plaintiff argues that the City was deliberately indifferent in failing to train its police officers to identify detainees at risk for suicide, even if the plaintiff had identified the specific training not provided by the City, she has failed to establish the requisite causal connection. Specifically, there is no evidence in the record before the court that, even if the officers who came in contact with Ms. Cruise had been trained in screening for suicidal detainees, they could have prevented Ms. Cruise's suicide. As previously discussed, there is no evidence in the record that Ms.

38

Cruise exhibited manifestations of having suicidal tendencies. The plaintiff has produced no evidence to raise a material issue of fact as to whether a properly trained police officer "would have known, or would have to have been willfully blind not to have noticed, that [Ms. Cruise] posed a strong risk of suicide," given that she showed no signs of suicidal ideation. See Bowen v. City of Manchester, 966 F.2d 13, 20 (1st Cir. 1992). To this extent, the defendants' motion for summary judgment will be granted.

Finally, with respect to the plaintiff's claim that the City was deliberately indifferent in failing to train its police officers in properly monitoring detainees, the plaintiff has failed to identify any specific training which the City was aware of, but did not give, which would have prevented the suicide of Ms. Cruise. The plaintiff has provided an expert report, in which the expert concludes that the Scranton Police Department had inadequate written rules and procedures with respect to, among other things, staff training and supervision of detainees. The expert further concludes that there is no evidence from his review of the evidence in the record[27] that members of the Scranton Police Department received any training with respect to the proper care and custody of inmates. The report goes on to criticize the policies and procedures which were in place for monitoring inmates[28], but he never sets forth the specific

---

[27]The court notes that the expert did not review all of the evidence currently before the court.

[28]For instance, the expert references the written policy in the Scranton Police Department's Rules and Regulations with respect to the job (continued...)

training which the City could have provided, but consciously chose not to provide. To this extent, the plaintiff has not met the requirements of establishing a failure to train claim with respect to the monitoring of detainees. Therefore, the defendants' motion for summary judgment will be granted in this respect.

As noted by the court in <u>Pifcho</u>, this decision is by no means "a vindication of every aspect of the policies or training that the City of Scranton has provided to its officer." It goes without saying that the death of Deborah Cruise is a tragedy beyond comprehension for her family. In a perfect world her suicide never would have occurred. However, based upon the record before the court, the plaintiff has failed to establish more than negligence against the defendants, which can not sustain a claim pursuant to §1983 with respect to the policies and training of officers by the City.

## V. CONCLUSION

On the basis of the foregoing, **IT IS HEREBY ORDERED THAT:**

(1) the defendants' motion for summary judgment, **(Doc. No. 41)**,

is **GRANTED**; and,

---

[28](...continued)
descriptions of the Desk Officer and Wagon Officer and notes that the officers did not follow the policy and were confused with respect to who had the primary responsibility of monitoring the detainees. He further references the use by the Scranton Police Department of the video monitoring and indicates that such monitoring systems are controversial.

(2) the clerk of courts is directed to close the case.

S/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:**  December 12, 2005
O:\shared\Memorandums\2001 MEMORANDUMS\01-2310.01.wpd

41